Estate of John B. Bryan, Deceased, Security First National Bank of Los Angeles and Margaret Bryan Smith, Executors v. Commissioner.
Estate of Bryan v. Commissioner
Docket No. 106494.
United States Tax Court
1943 Tax Ct. Memo LEXIS 331; 1 T.C.M. (CCH) 1030; T.C.M. (RIA) 43208; April 30, 1943
*331 1. Gifts made by decedent to his widowed daughter, decedent being in good physical and mental condition for a man of his age, held, to have been motivated primarily by a desire to provide means for the support of his daughter and her family rather than by an apprehension of death, and consequently, the transfers are not includible in decedent's gross estate as having been made in contemplation of death. 2. The value of shares of stock owned by decedent at the time of his death determined upon the record. Ralph W. Smith, Esq., 808 Bank of America Bldg., Los Angeles, Calif., for the petitioners. Frank T. Horner, Esq., for the respondent. ARUNDELL
lenge the determination of an estate tax deficiency in the amount of $121,872.33 and claim to have overpaid the correct estate tax liability by the sum of $10,437.97. It is agreed that many of the issues raised by the pleadings may be settled in the recomputation under Rule 50. The principal questions to be decided are whether gifts made by the decedent to his daughter were transfers in contemplation of death, and the value of certain shares of stock, of which some were involved in the above transfers and others were owned by decedent at the *332 time of his death. Findings of Fact Petitioners are the executors of the Estate of John B. Bryan, who died a resident of California on September 18, 1938, at the age of 75 years, 8 months, and 10 days. The estate tax return was filed with the Collector for the sixth district of California. Decedent had a gross estate, as computed by respondent in the deficiency notice, of $869,011.83. For a great many years prior to his death decedent had been associated as an officer, director, and substantial stockholder with the Lawyers' Co-operative Publishing Company of Rochester, New York, and its subsidiary, Bancroft-Whitney Company of San Francisco, California. Both companies are engaged in the business of publishing law books. For a number of years decedent was vice president of the former company and president of the latter. The Bancroft-Whitney Company maintained a branch office in Los Angeles, California. Decedent owned homes in Rochester, New York, and in Pasadena, California, and after 1920 he and his wife resided in Rochester during the summer months from April or May until about October, and in Pasadena the remaining months of each year. Decedent took a great pride in the business *333 and was actively interested in it, although in 1936 and 1937 he went to the office in Los Angeles only two or three times a month. He made occasional trips to the San Francisco office, and generally kept informed of the affairs of both companies through correspondence and telephone. Decedent's only child was a daughter, Mrs. Smith, who had married in 1920 and taken up her residence in southern California. She had two daughters of her own, who were 14 and 8 years of age in 1936. Mrs. Smith's husband was manager of the Los Angeles office of Bancroft-Whitney Company at a salary in the neighborhood of $7,000 per annum. Decedent and his wife had always given their daughter a substantial allowance. This was continued after her marriage and the amounts were increased after the arrival of the children. By 1936 the allowances approximated $10,000 a year. Two of decedent's personal and business friends, one of whom was Mrs. Smith's cousin, had urged him for many years to make a substantial gift to his daughter to relieve her of continued dependence upon him for her allowance. Decedent, however, lacked confidence in his son-in-law and feared that the latter might dissipate a gift if one were *334 made. The daughter was divorced from her husband in the fall of 1935 and the husband committed suicide in New York City on January 30, 1936. A few days later decedent and his wife expressed their intention to give the daughter a substantial amount of stock so that she would be independent and have sufficient funds for her support and the care and education of her two children. Decedent showed his daughter at that time a tentative list of stock he planned to give her. The parties were in California at that time, while the stock certificates were in decedent's safe deposit box in Rochester. Two business associates of decedent, however, had access to the box. Mrs. Smith's husband had left a small estate which was divided equally among a sister, a brother, Mrs. Smith, and their two children. The intention of decedent and Mrs. Bryan to make a gift to the daughter was communicated by them to three intimate friends of the family shortly after the son-in-law's death. Following the death of her husband the daughter had a heart attack and was advised that she needed a rest. In February of 1936, therefore, plans were begun for her to take a trip to Europe. She and her two daughters sailed *335 for England on May 3, 1936. Decedent and his wife each gave her $2,500 in travelers' checks to take care of their expenses during the summer. Mrs. Smith returned to Rochester, New York, in September 1936 and returned to her home in California about a week later. While in Rochester decedent again showed her a list of the stocks he intended to give her. The gift of the stock was made by decedent to his daughter in November 1936. Decedent's wife made her an identical gift. They each gave her 100 shares of Bancroft-Whitney Company common stock and 500 shares of Lawyers' Co-operative Publishing Company common stock. The daughter maintained her own separate home and at the time in question her two children were in private schools. Prior to this gift the daughter had only a few shares of Lawyers' Co-operative Publishing Company stock which netted her an income of approximately $300 a year. The allowances that had theretofore been given to the daughter were discontinued as soon as she began receiving dividends on the gift stock. The dividends thereon were approximately equal to, or a little more than, the amount of allowances she had been receiving. At the time the gift was made and during *336 1936 and 1937 decedent's general physical condition was good for a man of his age and his outlook on life was optimistic and hopeful. He was energetic and was characterized by one of his physicians as a typical high-speed, over-weight businessman. A physical examination in 1933 revealed that he had a mild case of chronic prostitis. In March 1935 decedent had a complete urological cystoscopic examination, which disclosed that he had an inflammation in the prostate gland. This resulted in an irritation causing a frequency of nocturnal urination. Such a condition is prevalent in men over seventy years of age and is more of a nuisance than a detriment to health. Decedent was advised of his ailment and of the fact that it was not serious. Massage treatments were given. Decedent returned to his doctor in Rochester in May 1935, complaining of his prostate trouble, and at that time it was discovered that he had an infection in his throat. The infection developed into pneumonia and decedent was hospitalized in Rochester on June 10, 1935. He was seriously ill with pneumonia but made a complete recovery and was discharged from the hospital on June 26, 1935. He was strong enough shortly thereafter *337 to make his annual trip to California, and while his strength was somewhat slow in returning his convalescence was normal. Decedent continued to be bothered with his prostate irritation, which was painful at times, and he complained a great deal about it. On July 27, 1936 he was admitted to a hospital in Rochester and underwent a transurethral operation on his prostate gland. The operation was performed with little difficulty and was not serious. Decedent responded well after the operation and left the hospital on August 17, 1936. The operation, however, did not cure his prostate condition and he continued to be annoyed by frequency of urination. In the spring of 1937 decedent's wife suffered a heart attack and was taken to a hospital in California, where she died a few weeks later on May 17, 1937. Decedent was admitted to the hospital as a patient primarily to be near his wife. He was given a complete physical examination and was treated for his prostate condition, which at that time disclosed an enlargement of the prostate gland. He was worried over his wife's condition. He had a slight hand tremor which was attributed to Parkinson's disease. This disease is known not to shorten *338 life; it is a chronic tremor. He also had a slight degree of arthritis in his ankles and wrists. The diagnosis also revealed multiple sclerosis, which in the physician's opinion did not amount to anything. It is a common complication of advanced age. At no time did decedent ever appear worried over his physical condition. He never expressed an apprehension of death to any of the physicians who treated him. When confined to a hospital he was irritable and disagreeable, annoyed at being down. He was an egotistical man and was disgusted that he was troubled with common ailments. His heart and blood pressure were normal for a man of his age. The principal cause of his death on September 18, 1938, was stated on the death certificate to be arteriosclerosis and cerebral hemorrhage "followed by pneumonia about three years ago." The gifts of $2,500 in the spring of 1936 and of stock in November 1936 were not transfers made by decedent in contemplation of death. There was not much change in decedent's health or his outlook toward life until a month or six weeks before he died. He continued doing the things he had been accustomed to do for many years. He missed his wife very much after she *339 had passed away. Her death was a great shock to him. They had been very devoted to each other and had been inseparable during their more than 50 years of married life. On February 19, 1937, they had executed wills in which each left his entire estate to the other. Shortly after his wife's death decedent, on May 29, 1937, executed a new will, which was the will that was probated. In it he gave certain property outright to his daughter and left the residue in trust, five per cent of the trust corpus to be distributed to the daughter annually. Trust income was to be immediately added to corpus upon receipt thereof by the trustee. After decedent had acquired possession of his wife's estate, following her death, he was urged by a business and personal friend, the same one referred to hereinabove who was the daughter's cousin, to make another gift to his daughter. The friend advised him that he could reduce his income tax in this manner, and also that his daughter should be made more independent. Decedent discussed with his daughter the making of another gift to her in February or March 1938. He told her he would like to do so, because his expenses had decreased whereas hers were increasing, *340 and also that he thought she needed to learn how to handle money. In April 1938, decedent gave his daughter various securities in eight companies which had a value of $69,959.50, as determined by respondent, and of $65,834.50, as contended by petitioners. Included in such stocks were 330 shares of the new common stock of the Lawyers' Co-operative Publishing Company. The gift made by decedent to his daughter in April 1938 was not made in contemplation of death. The Lawyers' Co-operative Publishing Company of Rochester, New York, incorporated in 1882, is the second largest law book publisher in the United States. It has a corps of salesmen throughout the United States and maintains a branch office in New York City. In 1938, the company had between 300 and 400 employees. In April 1938, it was reorganized by issuing four shares of new common stock for one share of old common stock. Prior to the reorganization there were 18,000 shares of old common stock and 2,000 shares of preferred stock outstanding. At the time decedent died, on September 18, 1938, there were 72,000 shares of the new common stock outstanding, most of which was owned by three families. Decedent owned 2,800 of these *341 shares when he died, and a few months earlier, on April 19, 1938, he had transferred 330 shares of the new common stock to his daughter. In addition to these shares decedent had given 500 of the old common shares, or the equivalent of 2,000 of the new common shares, to his daughter in November 1936. Petitioners returned as part of decedent's gross estate the 2,800 shares he owned at the date of death, ascribing a value of $25 per share to them, or a total of $70,000. In the notice of deficiency respondent determined that the shares were worth $37.50 each, or a total of $105.000; and, as above noted, he also held that the shares given to decedent's daughter in 1936 and 1938 should be included in gross estate as gifts made in contemplation of death at the same figure, $37.50, or an aggregate for the 2,330 transferred shares of $87,375.00. All but one of the officers of the company were members of one or another of the three family groups which owned the bulk of its shares. Gross sales increased from $1,580,717 in 1934 to $2,175,028 in 1938. Net earnings per common share for the years 1933 to 1938, inclusive, averaged $2.71 per annum. Dividends per common share averaged a little more *342 than $2.00 per annum. The fair market value of the new common stock of Lawyers' Co-operative Publishing Company on the date of decedent's death was $32.50 per share. The Lawyers' Co-operative Publishing Company acquired control of the Bancroft-Whitney Company following the earthquake and great fire in San Francisco when the latter company was in financial distress. This company was likewise reorganized in April 1938 and new common stock was issued on the basis of four shares for each share of old common stock. In connection with the reorganization 2,500 shares of preferred stock were retired and cancelled. On September 18, 1938, there were 13,670 shares of Bancroft-Whitney common stock outstanding, of which the Lawyers' Co-operative Publishing Company owned 7,132. Decedent owned 500 shares and in addition had transferred 100 of the old shares (equivalent to 400 of the new) to his daughter in November 1936. The balance of the stock was owned by less than 30 stockholders, who, aside from a few family groups, were primarily salaried employees. The stock has never been listed on an exchange or traded over the counter. The only market was family or employee groups. The Lawyers' Co-operative *343 Publishing Company had a prior right to purchase any of the Bancroft-Whitney stock that was offered for sale. All assets of the company are carried on its books at cost or, in the case of plant and equipment, at cost less depreciation. The book value of the common stock at the end of 1938 was approximately $115 per share. The principal asset of the company was notes and accounts receivable, principally due from the legal profession. The net earnings of the company for the years 1933 to 1938, inclusive, were in the following respective amounts: $13,282.23, $40,868.15, $7,739.11, $28,445.80, $54,695.76, and $56,881.12, or an average of approximately $33,000. During each of the years 1933 to 1937, inclusive, it paid preferred dividends of $15,000, and in each of the years 1933, 1934 and 1936, it paid dividends on its common stock in the sum of $25,000, and dividends on the common stock amounted to $75,000 in 1935 and $37,500 in 1937. In 1938, the earnings amounted to $4.15 per common share and a dividend of $49,781, or $3.65 per common share, was paid. The few sales that were made at or around the date in question here were made at a price of $75 for the new common shares. The fair *344 market value of the new common stock of the Bancroft-Whitney Company on September 18, 1938 was $75 per share. On or about December 15, 1939, petitioners filed the estate tax return for decedent's estate and paid $29,692.78, the amount of the tax shown due thereon. The notice of deficiency was issued on November 28, 1940, and the petitioner herein was filed on February 21, 1941, and was amended to make claim for overpayment on October 22, 1942. Opinion ARUNDELL, Judge: Our first question is whether the gifts made by decedent to his widowed daughter in 1936 and April 1938 were transfers made in contemplation of death. The Commissioner has determined that they were, and in addition to the usual presumption of correctness of that finding petitioners are confronted by the statutory presumption that gifts within two years of death of a material part of a decedent's property are made in contemplation of death. The question is one of fact, requiring a careful scrutiny of the circumstances "to detect the dominant motive of the donor in the light of his bodily and mental condition, and thus to give effect to the manifest purpose of the statute." . *345 Our judgment upon the facts revealed in the present case is embodied in our findings of fact that the gifts were not made in comtemplation of death. It will suffice here to state briefly some of the considerations that have led us to this conclusion. For the first gift an urgent motive associated with life rather than death is made to appear. Decedent and his wife had been accustomed to giving their daughter substantial allowances, which were continued after her marriage in 1920 and increased from time to time until in the later years they approximated $10,000 a year. The daughter had two children of her own, both of whom attended private schools. Her husband was branch manager of Bancroft-Whitney Company, of which decedent was president and a substantial stockholder. The daughter divorced her husband in the fall of 1935 and the husband committed suicide at the end of January 1936. He left but a small estate, and his salary, of course, was no longer available to help in the daughter's support. She had practically no estate of her own. Immediately following the son-in-law's death decedent and his wife determined to make a gift to their daughter and this determination was communicated *346 by them to her and others. As soon as the gifts were made the allowances discontinued, a strong indication that their purpose was to discharge the moral obligation to care for a child in need. The Commissioner would discredit these facts as furnishing the donative motive by pointing to the delay of approximately ten months between the son-in-law's death and the time the gifts were actually consummated, and by arguing that there was no reason for making the gifts at all, i.e., that continuation of the long-standing policy of giving allowances to the daughter would have served to support her and her two children as well as the outright gifts. It appears in the record that decedent had been urged for many years to make a substantial gift to his daughter. The urging had come from two very intimate business and personal friends, one of whom was his daughter's cousin. They had in mind the welfare of the daughter, and had urged an outright gift to enable her to escape from day-to-day dependence. It appears that one of the reasons why such a gift was not made many years before 1936 was that decedent had no confidence in his son-in-law and feared that an outright gift to the daughter might *347 have been dissipated by her husband. In the light of these circumstances we draw nothing from the argument that the allowances could have been continued. Decedent saw fit to make an outright gift when he thought he could do so with safety, in lieu of future periodic payments. The motive was to provide a means of support to his daughter for herself and her family. That another method could have been continued does not tend to the conclusion that death was contemplated in making the gift. Nor do we attach any significance to the ten months' delay. If decedent's health in the meantime had taken a decided turn for the worse or if other circumstances had arisen suggesting an apprehension of death, a different conclusion may have been warranted. But nothing of that sort appears here. The decedent expressed an intention to make a gift and he later carried that intention into effect. When the gift was first discussed the parties were in California and the stock certificates were in Rochester, New York. Shortly after the son-in-law's death plans were begun to send the daughter to Europe for a rest and decedent and his wife furnished the necessary cash for this purpose. Doubtless, plans for *348 the trip diverted attention from the contemplated gift. When the daughter returned in September decedent repeated his intention to make the gift, and the gift was actually made in November. In our view the delay was due only to the procrastination that attends so many everyday family transactions. In addition to a convincing motive thus established, the evidence negatives the contention that by reason of his physical or mental condition decedent was moved by thoughts of approaching death. At the time the gift was made decedent was in good physical condition for a man of his age. It is true that some nine physicians who had attended decedent presented evidence in this proceeding; that might indicate offhand that decedent was either sickly or thought he was. But the testimony of all the doctors, six of whom were called by respondent, convinces us that decedent had no apprehension of death by reason of any physical infirmities. The existence of a chronic ailment that is not serious or so regarded by the decedent is not sufficient to warrant a finding that he contemplated death. . He was optimistic and hopeful of life. *349 So far as appears, he never intimated to any of his physicians an apprehension of death. He had a great devotion for his wife and was more concerned over her health than his own. He was an arrogant, egotistical man, who was disgusted that he should be troubled with common ailments that beset ordinary humans. His attitude was one which we do not associate with an expectancy or apprehension of death. The record with respect to the gift in April 1938 is not so detailed or convincing, but the testimony stands uncontradicted that the gift was urged upon decedent by an associate as a means of income tax savings and that decedent stated at the time the gift was made, or just prior thereto, that he wanted his daughter to learn how ho handle money and that he thought she needed more income. These are valid motives negating contemplation of death. Decedent's property and income had recently been increased by receipt of his wife's estate. Those who knew him and were in close contact with him testified that there had been no noticeable change in his health or mental outlook. So far as the record shows he did not visit a doctor from *350 the time his wife died. The only altered circumstance was the death of his wife. It is perhaps conceivable that the passing of one so close to him brought promptings or a realization that his own life was drawing to a conclusion, though in this case this would be a mere inference without evidentiary support. In the face of testimony establishing motives connected with life we do not think that such an inference would warrant a finding that the burden of proof has not been carried. There remains the question of stock valuation. We have found a value of $32.50 per share for the Lawyers' Co-operative Publishing Company common stock. This finding is based upon a consideration, among other factors, of the nature of the company's business and assets, its consistent earning ability, the fact that the management was efficient and was vested in those who had a vital proprietory interest in the business, the prices at which the few sales at or about the time in question were made, and the fact that there was always a ready, though restricted, market for the stock. We do not think the value was materially affected by its limited market, for it is clear that the families that owned the stock *351 were extremely jealous of it and would acquire any available shares rather than permit them to fall into strange hands. The value we have found, in relation to the company's earnings, also corresponds with the ratio between the market price and earnings of a list of corporations, which list was prepared by petitioners' only witness on valuation. We are of opinion, however, that the evidence affords no adequate basis for disturbing the value put upon the Bancroft-Whitney stock by respondent. The principal criterion used by petitioners' witness, ten times average annual earnings, fails of material assistance here, for it results in a figure of $22.00 a share based upon petitioners' computation, a figure wholly out of line with the value contended for either by petitioners or respondent, which is $50 and $75, respectively. Realizing this, petitioners witness stated that "the capital structure back of the Bancroft-Whitney Company stock is so high that I am willing to double that and say that the excessively high capital structure strengthens their dividend paying ability; that is to say, helps them have continuity to their dividend even when they do not earn it." All sales of the stock *352 that took place were made at the price respondent has adopted, and though they were few in number the witness referred to the price as "the standard price." It was the price at which treasury stock was to be issued. The book value of the stock was in excess of $100 per share. The books were maintained at cost, and there is no evidence that the fair market value of the assets was less than cost. The witness testified that the company's business was on the decline. The history of the company's volume of sales was not introduced, but the balance sheets and statement of net earnings that were presented fail to disclose any market decrease in business. We, therefore, sustain respondent's determination on this issue. It was agreed at the hearing of the present case that the proper amounts allowable as deductions for property previously taxed and for additional administration expenses, as well as the correct amount of credit allowable for gift and state inheritance taxes, could be settled in the recomputation under Rule 50. Decision will be entered under Rule 50.